O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WAYNE CHARLES and FORT SELF STORAGE, | ) ) ) | CASE NO.: CV 10-7260 ABC (PLAx) |
| Plaintiffs, | ) ) ) | ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | ) ) | |
| CITY OF LOS ANGELES, a California municipal corporation, | ) ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

Pending before the Court is Plaintiffs Wayne Charles and Fort Self Storage, Inc.'s ("Plaintiffs'") Motion for Preliminary Injunction, filed on October 11, 2010. (Docket No. 14.) The City of Los Angeles (the "City") opposed on October 25, 2010 and Plaintiffs replied on November 1, 2010. Finding oral argument unnecessary, the Court vacated the November 15, 2010 hearing date and took the matter under submission on November 9, 2010. Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons below, the motion is DENIED.

**INTRODUCTION**

This is yet another case in the saga involving the City's attempts to regulate the proliferation of commercial billboards in Los Angeles.  Unlike other cases, Plaintiffs do not facially challenge any of the City's ordinances, including the City's distinction between commercial and noncommercial speech; indeed, it is settled law that the City may lawfully distinguish between commercial and noncommercial signs, restricting the former while permitting the latter.  See Outdoor Sys., Inc v. City of Mesa, 997 F.2d 604, 610, 610—11 (9th Cir. 1993); see also Maldonado v. Morales, 556 F.3d 1037, 1045—46 (9th Cir. 2009).  Nor do Plaintiffs facially challenge the City's limits on commercial billboards.  See World Wide Rush, LLC v. City of Los Angeles, 606 F.3d 676 (9th Cir. 2010); Metro Lights, LLC v. City of Los Angeles, 551 F.3d 898 (9th Cir. 2009). Instead, Plaintiffs here mount an as-applied challenge to the City's classification of their proposed billboard as a commercial sign requiring a permit under the City's Sign Ordinance, rather than a noncommercial sign exempt from permitting and other requirements.  As outlined below, given the deference owed to the City for its "reasonably graduated response to different aspects of a problem," Metro Lights, 551 F.3d at 910, and the Court's own review of the billboard at issue, the City's judgment that Plaintiffs' billboard was commercial was legally correct and eminently reasonable.

**FACTUAL BACKGROUND**

**A.   The Sign Ordinance**

Article 4.4 of the Los Angeles Municipal Code ("LAMC"), which contains the City's Sign Ordinance, does not prohibit signs bearing "ideological, political, or other noncommercial message[s]" if they

2

are otherwise permitted by that Article.  LAMC § 14.4.4(A).  It does require a permit for any off-site commercial sign, which is defined as "a sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located."  Id. § 14.4.2. Plaintiffs' proposed sign would be an off-site "temporary" sign under the City's Sign Ordinance, defined as "[a]ny sign that is to be maintained for a limited duration, not to exceed 30 days, including paper signs and other signs that are not permanently affixed to the ground or building."  Id. § 14.4.2.  Temporary signs are allowed under the following circumstances:

>     Sec. 14.4.16.  **TEMPORARY SIGNS.**
>
>         A.    **Permit Required.**  Notwithstanding any other
>               provision of this article, a building permit
>               shall be required for a temporary sign,
>               pennant, banner, ribbon, streamer or spinner,
>               other than one that contains a political,
>               ideological or other noncommercial message.
>               The permit application shall specify the dates
>               being requested for authorized installation and
>               the proposed location.
>
>         B.    **Area.**
>
>             1.    The combined sign area of temporary signs
>                   shall not exceed two square feet for each
>                   foot of street frontage.
>
>             2.    The combined sign area of temporary signs,
>                   when placed upon a window and any other
>                   window signs shall not exceed a maximum of
>                   ten percent of the window area.
>
>         C.    **Time Limit.**
>
>             1.    Temporary signs that require a permit
>                   shall be removed within 30 days of
>                   installation and shall not be reinstalled
>                   for a period of 30 days of the date of

removal of the previous sign.  The installation of temporary signs shall not exceed a total of 90 days in any calendar year.

2.    Temporary signs that do not require a permit shall be removed within 30 days of the date of installation of the sign.

D.    **Location.**  Temporary signs, including those that do not require a building permit, may be tacked, pasted or otherwise temporarily affixed to windows and/or on the walls of buildings, barns, sheds or fences.

E.    **Construction.**  Temporary signs may contain or consist of posters, pennants, ribbons, streamers or spinners.  Temporary signs may be made of paper or any other material.  If the temporary sign is made of cloth, it shall be flameproofed when the aggregate area exceeds 100 square feet.  Every temporary cloth sign shall be supported and attached with stranded cable of 1/16-inch minimum diameter or by other methods as approved by the Department of Building and Safety.

Id. § 14.4.16.

Two other provisions of the Sign Ordinance prohibit certain signs located near freeways:

**Sec. 14.4.5.   HAZARD TO TRAFFIC.**

A.    **Prohibition.**  No sign or sign support structure shall be erected, constructed, painted or maintained, and no permit shall be issued, if the sign or sign support structure, because of its location, size, nature or type, constitutes a hazard to the safe and efficient operation of vehicles upon a street or a freeway, or which creates a condition that endangers the safety of persons or property.

B.    **Hazard Referral.**  The Department of Building and Safety shall refer the following to the Department of Transportation for hazard evaluation and determination prior to the issuance of a building permit:

1.    All permit applications for signs that will be visible from and are located within 500 feet of the main traveled roadway of a freeway; and

     2. All other permit applications and any
      signs that are determined by the
      Department of Building and Safety to have
      a potential for hazard.

   C. **Hazard Determination.**  The Department of
    Transportation shall return to the Department
    of Building and Safety each application so
    referred to it together with a statement of its
    determination.  If the Department of
    Transportation determines that the sign or sign
    support structure will constitute a hazard, the
    Department of Building and Safety shall deny
    the application for permit.

**Sec. 14.4.6.   FREEWAY EXPOSURE.**

   A. **New Signs.**  No person shall erect, construct,
    install, paint, maintain, and no building or
    electrical permit shall be issued for any sign
    or sign support structure within 2,000 feet of
    a freeway unless the Department of Building and
    Safety has first determined that the sign will
    not be viewed primarily from a main traveled
    roadway of a freeway or an on-ramp/off-ramp.
    However, at the termination of an off-ramp, any
    wall sign located along the front line may be
    viewed primarily from the off-ramp.

    The phrase "viewed primarily from" shall mean
    that the message may be seen with reasonable
    clarity from a greater distance by a person
    traveling on the main traveled roadway of a
    freeway or on-ramp/off-ramp than by a person
    traveling on the street adjacent to the sign.

Id. §§ 14.4.5, 14.4.6.  The Sign Ordinance specifically provides that

temporary signs are subject to these traffic hazard and freeway

exposure provisions.  Id. § 14.4.3(D).

  **B.   Plaintiffs' Business and Proposed Sign**

   Plaintiff Wayne Charles is in the business of leasing wall space

for posting and operating signs bearing what he classifies as

"noncommercial messages."  (Wayne Decl. ¶ 3.)  Earlier this summer, he

traveled to Los Angeles to investigate opportunities to post signs; in

doing so, he reviewed the Sign Ordinance and concluded he could post

1  temporary signs.  (Id. ¶¶ 4-6.)  He eventually found a building at
2  1651 South Central Avenue, leased by Plaintiff Fort Self Storage, Inc.
3  ("Fort").[1]  (Id. ¶ 6.)  Wayne entered an agreement with Fort to lease
4  wall space to post the billboard at issue here.  (Id. ¶ 7.)

5      Plaintiffs claim that the signs to be posted "will bear content
6  related to motion pictures, theatrical productions, television and
7  radio programming, music, books, newspapers, paintings and other works
8  of art."  (Id. ¶ 9.)  However, Plaintiffs have provided the content of
9  only one proposed sign: an advertisement bearing the logo for the show
10 "E! News" on the Entertainment Network and images of the show's two
11 hosts, Ryan Seacrest and Giuliana Rancic.  (Compl., Ex. A.)  Because
12 Plaintiffs believe that this sign is noncommercial, Plaintiffs did not
13 apply for a permit to post this sign, but they have not posted it or
14 any other sign out of fear that the City would enforce the Sign
15 Ordinance against it.  (Wayne Decl. ¶ 11.)

16     Plaintiffs approached the City about posting this sign, claiming
17 it to be non-commercial, and the City eventually sent Plaintiffs a
18 letter indicating that the sign was commercial, would violate the Sign
19 Ordinance, and warned Plaintiffs that criminal fines and other
20 penalties could accrue from posting non-permitted commercial signs.
21 (Wayne Decl. ¶ 22; Compl., Ex. B.)  The letter referred to the Sign
22 Ordinance's permitting requirements for off-site, supergraphic, and
23 temporary signs, but did not refer specifically to the Traffic Hazard
24 or Freeway Exposure provisions.  (Compl., Ex. B.)  The letter did note

25 _____

[1]During its investigation, the City was unable to locate 1651 South
26 Central Avenue, but did locate a building at 1609 South Central Avenue
   occupied by Fort.  (Zamperini Decl. ¶ 3.)  The photographs taken by
27 the City and the photographs submitted by Plaintiffs verify that they
   are referring to the same location and building.  (Compare Compl., Ex.
28 A with Zamperini Decl., Exs. 1-11.)

that the "subject signs may additionally violate other provisions of state or local law." (Id.)

To date, Plaintiffs have not erected any sign at this location. (Wayne Decl. ¶¶ 22-23.)  Instead, they filed a complaint, alleging that the signs they seek to erect are non-commercial and that the City's prohibition of the signs violates Plaintiffs' speech rights under the First Amendment of the U.S. Constitution and Article I, § 2 of the California Constitution.[2]  By way of this motion, Plaintiffs seek a preliminary injunction that would permit them to immediately erect their proposed "E! News" billboard for thirty days as limited by the Sign Ordinance's temporary sign regulation, and, after that, to erect additional unidentified signs at the same location.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., __ U.S. __, __, 129 S. Ct. 365, 374 (2008).  This recitation of the requirements for a preliminary injunction did not completely erase the Ninth Circuit's "sliding scale" approach, which provided that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Alliance for Wild Rockies v. Cottrell, __ F.3d __, __, 2010 WL 3665149, at *4 (9th Cir. Sept. 22, 2010).  In one version of the "sliding scale," "a preliminary injunction could issue where the

---

[2]Plaintiffs also applied for a temporary restraining order, which was denied.  (Docket No. 8.)

7

likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." Id. (brackets in original).  This "serious questions" test survived Winter.  Id. at *4—5.  Therefore, "'serious questions going to the merits' and a hardship balance that tips sharply in the plaintiff's favor can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." Id. at *8.

Importantly, a preliminary injunction may be denied on the sole ground that the plaintiff has failed to raise even "serious questions" going to the merits.  See Guzman v. Shewry, 552 F.3d 941, 948 (9th Cir. 2009) ("[A]t an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation.").  If the Court so concludes, it need not address the other preliminary injunction factors.  See Advertise.com, Inc. v. AOL Advertising, Inc., 616 F.3d 974, 982 (9th Cir. 2010).

## DISCUSSION

The parties essentially agree that the only legal issue on the merits of Plaintiffs' claims is whether the sign they propose to erect may be properly classified as commercial.  (Compl. ¶ 26; Opp'n 1; Reply 1.)  However, the City also raises several jurisdictional arguments, which the Court turns to first, as the lack of jurisdiction would compel dismissal of Plaintiffs' motion for a preliminary injunction and dismissal of the case.  See Amerco v. N.L.R.B., 458 F.3d 883, 890-91 (9th Cir. 2006) (affirming dismissal of preliminary injunction based on lack of subject-matter jurisdiction).

8

**A.   Jurisdiction**

The City raises two arguments that it believes undermine jurisdiction in this case: (1) Plaintiffs lack standing because independent restrictions in the Sign Ordinance would preclude their signs, regardless of whether they are commercial or noncommercial, so a favorable decision would not redress Plaintiffs' injury; and (2) the claims are not ripe because Plaintiffs have not erected their proposed signs and the City has not taken any enforcement action against them. Based on the sparse record before the Court, the Court rejects both contentions, although without prejudice to the City's ability to raise them at a later time.

**1.   Standing and Redressability**

"Standing" is an essential element to the case-or-controversy requirement of Article III of the U.S. Constitution. Wolfson v. Brammer, 616 F.3d 1045, 1056 (9th Cir. 2010). The "'irreducible constitutional minimum'" of standing requires the party asserting jurisdiction to establish three elements: "(1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury." Id.

The City argues that the third standing requirement is missing here because, even if Plaintiffs' signs are noncommercial, they would be barred by independent, unchallenged provisions of the Sign Ordinance. See Get Outdoors II, LLC v. City of San Diego, 506 F.3d 886, 892-84 (9th Cir. 2007). In Get Outdoors, billboard companies sought sign permits that were denied because they violated a ban on off-site signs; the city later argued that they would have been independently barred by the city's height and size restrictions. Id.

1   at 889-90.  As a result, the companies' injuries would only be

2   redressed—that is, they would be permitted to erect their signs—to the

3   extent that both the size and height restrictions and the off-site ban

4   were found invalid.  Id. at 893.  Because the size and height

5   restrictions were valid and could have prohibited the billboards

6   independently of any other restriction, the companies lacked standing

7   to challenge the off-site sign ban.  Id. at 894.

8       Relying on Get Outdoors, the City claims that, even if the Court

9   were to find Plaintiffs' proposed billboard to be noncommercial

10  speech, it could not be erected without violating the Hazard to

11  Traffic and Freeway Exposure restrictions in the Sign Ordinance.  LAMC

12  §§ 14.4.5, 14.4.6.  However, based on the current record, the Court is

13  not convinced that Plaintiffs' sign would be barred by these

14  provisions if it were considered noncommercial.

15      First, the City has not demonstrated that the Hazard to Traffic

16  provision would apply to Plaintiffs' sign if it were deemed

17  noncommercial and exempt from permitting requirements.  While the

18  language in subsection (A) suggests such a conclusion,[3] the City does

19  not invoke subsection (A) to argue that Plaintiffs' sign would be

20  banned even if noncommercial.  Instead, the City argues that

21  subsections (B) and (C) bar Plaintiffs' sign because Plaintiffs did

22  not first apply for a permit.  In the words of the City, "[w]ithout a

23  permit application, the Department of Building and Safety could not

24  make the required hazard to traffic determination and referral to the

25  _____

26      [3]That subsection prohibits erecting any sign and issuing any sign
    permit "if the sign or sign support structure, because of its
    location, size, nature or type, constitutes a hazard to the safe and
27  efficient operation of vehicles upon a street or a freeway, or which
    creates a condition that endangers the safety of persons or property."
28  LAMC § 14.4.5(A).

1  Department of Transportation." (Opp'n 10.) However, temporary
2  noncommercial signs do not need to be permitted under the Sign
3  Ordinance. Thus, if Plaintiffs' sign was deemed noncommercial, there
4  is no permit application to refer to the Department of Transportation
5  and subsections (B) and (C) would not apply to bar Plaintiffs' sign.[4]

6       The application of the Freeway Exposure restriction presents a
7  closer question. It bans all signs—commercial or not—within 2,000
8  feet of a freeway, unless the Department of Building and Safety
9  determines that they will not be "viewed primarily from a main
10 traveled roadway of a freeway or on-ramp/off-ramp." LAMC § 14.4.6.
11 Plaintiffs do not dispute that the sign they propose will be erected
12 twelve feet from the 10 Freeway to the south and 27 feet from the
13 westbound on-ramp at 16th Street to the north. (Zamperini Decl. ¶ 5.)
14 From the photograph attached to the complaint showing where the sign
15 would go, it would face the 10 Freeway. (Compl., Ex. A.) While the
16 photographs suggest that Plaintiffs' signs would fall within this
17 provision, the City has not offered any evidence that the provision
18 would actually be enforced to prohibit the sign. The City did not
19 cite the provision in its enforcement letter or offer a declaration
20 from any City official that the sign would be barred by this
21 provision, and that evidence is necessary to demonstrate that this
22 provision would have been a "secondary cause" of the rejection of
23 Plaintiffs' sign. See Get Outdoors II, 506 F.3d at 892 (finding the

24
---

25 [4]The Court expresses no opinion beyond the conclusion that Plaintiffs'
   sign would not be barred by subsections (B) and (C) of the Hazard to
   Traffic provision for the failure to seek a permit. The Court does
26 note that subsections (B) and (C) might very well bar Plaintiffs' sign
   if it is deemed commercial. Even then, however, the City did not cite
27 this provision in its enforcement letter to Plaintiffs and has offered
   no evidence that it would actually apply this provision to bar
28 Plaintiffs' sign. Cf. Get Outdoors, 506 F.3d at 892.

"secondary cause" of permit denials were size and height restrictions based on affidavits that the provision would have been enforced, even though permit denials themselves did not cite size and height restrictions as grounds for denial). As the record stands now,[5] the Court cannot say that this provision would definitely bar Plaintiffs' signs, so a favorable decision could redress their alleged injury.[6] Thus, Plaintiffs have at this point demonstrated standing to seek preliminary injunctive relief as to their proposed E! News sign.

     2.   Ripeness

Claims are constitutionally ripe only when they present injuries that are "'definite and concrete, not hypothetical or abstract,'" which can include pre-enforcement injuries, so long as the plaintiff has shown a "genuine threat of imminent prosecution.'"  Wolfson, 616 F.3d at 1058 (emphasis in original).  A claimed threat of prosecution is "genuine" when: (1) the plaintiff has articulated a concrete plan to violate the law at issue; (2) the prosecuting authorities have

---

[5]This is not to say that the City could not make this showing at a later time.  The Court's conclusion rests only on the sparse record provided in conjunction with the pending motion.

[6]Plaintiffs' other arguments as to why the Freeway Exposure would not apply lack merit and the Court addresses them briefly so Plaintiffs do not raise them again.  First, the Freeway Exposure restriction is not inoperative because the Ninth Circuit's World Wide Rush opinion did not explicitly deem it "constitutional"; the Court rejected the only ground upon which this Court found the provision invalid and the City was free at that point to revive it.  See World Wide Rush, 606 F.3d at 684–87.  Second, nothing in this restriction suggests that it is a permitting requirement like the Hazard to Traffic provision.  It neither mentions a "permit" nor gives "permission" to do anything; it simply imposes a requirement on all signs in the specified area that must be satisfied before a permit can be sought for commercial signs or before a noncommercial sign can be erected.  Third, this section plainly applies to noncommercial signs.  Section 14.4.4 permits noncommercial signs "otherwise permitted by this article."  If a noncommercial sign is prohibited by the Freeway Exposure provision, then it would not "otherwise [be] permitted by" the Sign Ordinance.

communicated a specific warning or threat to initiate proceedings; and (3) there is a history of past prosecution under or enforcement of the challenged statute.  Id.

Contrary to the City's argument, Plaintiffs' claims regarding the E! News billboard are ripe even though they have not erected signs yet and have not been forced to take them down.  Cf. Nat'l Adver. Co. v. City of Miami, 402 F.3d 1335, 1339-40 (11th Cir. 2005) (finding First Amendment challenge to billboard law unripe because plaintiff "never properly pursued its claim through the administrative process that the City's zoning ordinance made available to them" and never obtained a denial of a permit application).  Plaintiffs presented to the City the E! News billboard and claimed it was exempt from the City's permitting requirement because it was noncommercial.  The City disagreed with Plaintiffs' assessment, deemed the billboard commercial, and threatened criminal and civil sanctions if Plaintiffs were to erect the billboard without a permit.  That more than satisfies the first two requirements outlined in Wolfson.  The third criterion is also satisfied: the Court is acutely aware of the City's efforts to enforce the sign ordinance against other companies, given the many lawsuits pending before this Court.  Thus, there is little doubt that Plaintiffs' challenge to the application of the Sign Ordinance to the E! News billboard is ripe for review.[7]  See Wolfson, 616 F.3d at 1059-60.

---

[7]To the extent the City is arguing that Plaintiffs' claims are unripe for not seeking and being denied a permit before filing suit, that contention hinges on the merits of whether Plaintiffs' sign is properly classified as commercial or noncommercial.  Thus, the Court will not address this question separately from the merits.

1    Plaintiffs further suggest, however, that they would like to
2  erect unidentified signs that would contain "content related to motion
3  pictures, theatrical productions, television and radio programming,
4  music, books, newspapers, paintings and other works of art."  (Wayne
5  Decl. ¶ 9.)  While Plaintiffs' claims related to the proposed E! News
6  sign are ripe, their claims are not ripe as to other signs, whose
7  content has only been vaguely identified and which may or may not be
8  subject to future actions based upon the nature of their content.  See
9  Wolfson, 616 F.3d at 1060 (finding ripeness exists where "the issues
10  raised are primarily legal, do not require further factual
11  development, and the challenged action is final."); see also id. at
12  1604 (explaining that a claim is not ripe "'if it rests upon
13  contingent future events that may not occur as anticipated, or indeed
14  may not occur at all.'").  Further, an opinion on the content of any
15  sign beyond the one sign whose content has been identified would be an
16  impermissible advisory opinion.  See Golden v. Zwicker, 394 U.S. 103,
17  108 (1969).  Thus, the Court addresses only Plaintiffs' challenge to
18  the proposed E! News billboard.
19    **B.  Likelihood of Success on the Merits**
20    The Sign Ordinance defines an "off-site" commercial sign as "a
21  sign that displays any message directing attention to a business,
22  product, service, profession, commodity, activity, event, person,
23  institution or any other commercial message, which is generally
24  conducted, sold, manufactured, produced, offered or occurs elsewhere
25  than on the premises where the sign is located."  LAMC § 14.4.2.
26  Using this definition, the City reviewed Plaintiffs' proposed E! News
27  sign and concluded it was commercial and required a permit.  The Court
28  finds the City's assessment both legally correct and reasonable.

1    As a general matter, the City may constitutionally distinguish

2 between commercial and noncommercial billboards.  See Outdoor Sys.,

3 997 F.2d at 610, 613; see also Maldonado, 556 F.3d at 1045-46.  In

4 order to apply that distinction, the City may also constitutionally

5 vest officials with the authority to determine when a sign is

6 commercial, since that neither vests an official with unfettered

7 discretion nor creates an unconstitutionally vague permitting scheme.

8 See Outdoor Sys., 997 F.2d at 613.; Nat'l Adver. Co. v. City & Cnty.

9 of Denver, 912 F.2d 405, 410 (10th Cir. 1990); Major Media of the Se.,

10 Inc. v. City of Raleigh, 792 F.2d 1269, 1272-73 (4th Cir. 1986).  As

11 the Ninth Circuit explained in Outdoor Systems:

12           Because our First Amendment jurisprudence
          recognizes a distinction between commercial and
13           noncommercial speech, government officials have to
          place a particular message into one or the other
14           category for purposes of regulation.  The
          potential difficulty of that categorization in
15           itself does not render the regulations
          unconstitutional. . . . [T]he city officials can
16           and must rely on judicial precedent to determine
          what is commercial speech . . . [and] sufficient
17           guidance in categorizing speech as commercial or
          noncommercial is provided by various decisions of
18           the Supreme Court.

19 997 F.2d at 613 (internal citations omitted).

20    The Supreme Court has identified three characteristics that, in

21 combination, indicate speech is commercial: (1) its advertising

22 format; (2) its reference to a specific product; and (3) an underlying

23 economic motive of the speaker.  See Bolger v. Youngs Drug Prods.

24 Corp., 463 U.S. 60, 67 (1983).  However, the Court in City of

25 Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 422-23 (1993),

26 seemed to suggest a narrower definition of commercial speech as speech

27 that, at its core, "propos[es] a commercial transaction."  The Ninth

28

1   Circuit has variously followed <u>Discovery Network</u>[8] and <u>Bolger</u>,[9] but has

2   specifically noted that both remain good law.  <u>See Ass'n of Nat'l</u>

3   <u>Advers. v. Lungren</u>, 44 F.3d 726, 730 (9th Cir. 1994); <u>Outdoor Sys.</u>,

4   997 F.2d at 610.  Under either test, the commercial/noncommercial

5   distinction is based on common sense, keeping in mind that commercial

6   speech must be examined "'carefully to ensure that speech deserving of

7   greater constitutional protection is not inadvertently suppressed.'"

8   <u>Discovery Network</u>, 507 U.S. at 423.[10]

9        Under either the <u>Bolger</u> test or the <u>Discovery Network</u> test,

10  common sense leads to but one conclusion in this case: Plaintiffs'

11  billboard was properly classified as commercial.  Plaintiffs admit

12  that "there are economic motivations for advertising E! News." (Reply

13  5.)  The sign uses the E! News logo and images of the show's hosts to

14  advertise a product in order to attract viewers.  By increasing

15  viewership, the show generates ratings, which then translate into

16  higher prices for commercials aired during the show.  The sign surely

17  faces the busy 10 Freeway for this very purpose.  And the proposed

18  sign contains no even arguably noncommercial content, indicating that

19  its purpose is purely to generate revenue, rather than to disseminate

20  any noncommercial message.

21       Plaintiffs cite a series of state and federal cases to argue that

22  advertising for noncommercial speech is itself noncommercial speech

---

23  [8]<u>See</u> <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 906 (9th Cir.
24  2002); <u>Hoffman v. Capital Cities/ABC, Inc.</u>, 255 F.3d 1180, 1185 (9th
    Cir. 2001).

25  [9]<u>See</u> <u>Ass'n of Nat'l Advers. v. Lungren</u>, 44 F.3d 726, 728 (9th Cir.
26  1994).

27  [10]The tests for the distinction between commercial and noncommercial
    speech under the California Constitution are the same as under the
28  First Amendment.  <u>See</u> <u>Kasky v. Nike</u>, 27 Cal. 4th 939, 958–59 (2002).

1  subject to full First Amendment protection.[11]  See, e.g., Page v.

2  Something Weird Video, 960 F. Supp. 1438, 1443-44 (C.D. Cal. 1996);

3  Lane v. Random House, Inc., 985 F. Supp. 141, 152 (D.D.C. 1995);

4  Guglielmi v. Spelling-Goldberg Prods., 25 Cal. 3d 860, 872-73 (1979)

5  (Bird, C.J., concurring); Rezec v. Sony Pictures Ent., Inc., 116 Cal.

6  App. 4th 135, 140-44 (2004); Polydoros v. Twentieth Cent. Fox Film

7  Corp., 67 Cal. App. 4th 318, 324-25 (1997).  All of these cases except

8  Rezec involved arguments that the First Amendment protected the use of

9  an individual's name or likeness, which was a defense to various state

10  tort claims, such as the right to publicity, see Page, 960 F. Supp. at

11  1443, or defamation, see Lane, 985 F. Supp. at 149.  In that

12  circumstance, the courts extended the First Amendment protection to

13  the use of the individual's likeness in advertising for the underlying

14  protected speech.  See, e.g., Guglielmi, 25 Cal. 3d at 872—73.  In

15  these cases, the protection extended to the advertising at issue

16  because it was merely "adjunct" or "incidental" to the core protected

17  noncommercial speech.  See id.; Page, 960 F. Supp. at 1443.

18      Unlike these cases, the proposed E! News billboard contains no

19  noncommercial content, such that the advertising could be considered

20  merely an "adjunct" to the underlying noncommercial speech.  See

21  Guglielmi, 25 Cal. 3d at 872—73.  In this respect, the Court finds the

22  decision in Rezec instructive.  In that case, the plaintiffs sued a

23  movie studio under state law for the false portrayal in advertising of

24  a fictitious critic giving favorable reviews of several movies.  116

25  Cal. App. 4th at 138.  Invoking many of the same cases Plaintiffs cite

26

27  [11]In a footnote in Bolger, the Supreme Court suggested this might be
possible.  Bolger, 463 U.S. at 68 n.14 (noting that advertising of an
activity itself protected by the First Amendment may not be

28  commercial).

here, the studio raised a defense that the advertising at issue was
noncommercial speech because it related to movies, which was
considered core noncommercial speech.  Id. at 141—42.  The court
rejected the argument, reasoning that, "[h]ad the advertisements here
been 'merely . . . adjunct[s] to the exhibition of the film[s]," as in
Guglielmi, "such as by using photographs of actors in the films, Sony
would have a point because, just as the films are noncommercial
speech, so is an advertisement reflecting their content."  Id. at 142.
Yet, the advertising at issue did not "reflect any character or
portion of the films," but rather a fictitious critic's favorable
opinions of the films, so they were purely commercial speech intended
to sell the films.  Id. at 142—43.  Here, too, Plaintiffs' billboard
does not reflect any content of E! News, apart from the E! News logo
and photographs of the hosts, which was calculated merely to advertise
the E! News program.  Thus, the cases cited by Plaintiff do not
demonstrate that the E! News sign is anything but commercial.[12]

     Perhaps most important, unlike these cases, "'[w]e deal here with
the law of billboards,'" which is a "'method of communicating ideas .
. . unto itself.'"  See World Wide Rush, 606 F.3d at 684.  In this
context, the Court should give some deference to the City for its
"reasonably graduated response to different aspects of a problem."
Metro Lights, 551 F.3d at 910.  Given that the City may
constitutionally distinguish between commercial and noncommercial
signs, see Outdoor Systems, 997 F.2d at 610, and may constitutionally

_____

     [12]For these same reasons, the E! News billboard does not fall
within the category of noncommercial speech that is either promoted in
a paid advertisement or carried in a form sold for a profit.  See Va.
State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S.
748, 761 (1976),

grant officials authority to make that distinction, see id. at 613,
the City must be given some space to apply the tests for commercial
speech and to reach reasonable judgments as to what is and is not
commercial, lest federal courts become the first-line arbiters of
hundreds of thousands of billboards to be erected across the country.
There is no evidence to suggest that the City in this case has
attempted to use the commercial/noncommercial distinction to suppress
noncommercial speech and its judgment that the E! News billboard was
commercial was both legally correct and reasonable.  Plaintiffs have
failed to demonstrate any chance of success on the merits of their
First Amendment challenge.

### C.   Other Factors

Plaintiffs' failure to demonstrate a even a possibility of
success on the merits of their First Amendment claims alone defeats
its request for a preliminary injunction.  See Advertise.com, 2010 WL
3001980, at *7; Guzman, 552 F.3d at 948.  Even reviewing the other
factors, however, a preliminary injunction is not warranted.

As in most First Amendment cases, Plaintiffs here claim that
"'[t]he loss of First Amendment freedoms, for even minimal periods of
time, unquestionably constitutes irreparable injury.'"  Klein v. City
of San Clemente, 584 F.3d 1196, 1207—08 (9th Cir. 2009) (brackets in
original).  However, when a plaintiff does not show any chance of
succeeding on a First Amendment claim, harm cannot be presumed on the
basis that free speech rights have been violated.  See Lydo Enters.,
Inc. v. City of Las Vegas, 745 F.2d 1211, 1214 (9th Cir. 1984)
("Because we disagree with the court's conclusion that Lydo has made a
showing that First Amendment freedoms are in fact violated by the
ordinance, we cannot affirm a finding of irreparable harm on this

basis."). Plaintiffs offer no evidence of any other irreparable harm,
nor is there any. Plaintiffs are seeking to engage in the "business"
of posting signs (Wayne Decl. ¶ 3), and any harm in the delay in doing
so would be readily compensable with money damages.

Moreover, the balance of equities and the public interest weigh
against an injunction during the pendency of this case for several
reasons. First, Plaintiffs classify the only sign at issue—the E!
News sign—as "temporary," meaning that it could only be erected for
thirty days before the City could validly compel Plaintiffs to remove
it. LAMC § 14.4.16(C). Assuming Plaintiffs' case had even minimal
merit, any injunction would be limited to this thirty-day period,
after which Plaintiffs' challenge to the E! News sign would be moot.
Thus, any injunction would effectively provide Plaintiffs all the
relief they may properly seek in this lawsuit (that is, erecting the
one E! News sign for thirty days), while at the same time preventing
the Court from ever deciding the merits beyond this preliminary stage.
This is particularly problematic because a ruling in Plaintiffs' favor
now, no matter how doubtful Plaintiffs' claims, could potentially
invite a tidal wave of similar lawsuits that would consume vast
amounts of the City's and the Court's resources.[13]

The Court is acutely aware of the public interest in upholding
First Amendment principles and that serious questions regarding
Plaintiffs' speech rights can tip the balance of equities in
Plaintiffs' favor. See Sammartano v. First Judicial Dist. Ct., in &

---

[13]This occurred after this Court issued its opinion in World Wide
Rush, which was reversed on appeal. Indeed, counsel for Plaintiffs
knows this risk, as he represents a billboard company in one of the
cases that followed World Wide Rush. See Figueroa Project 2, LLC v.
City of Los Angeles, Case No. CV 08-5066 ABC (JWJx) (C.D. Cal. filed
Aug. 1, 2008).

1 | for Cnty. of Carson City, 303 F.3d 959, 973—74 (9th Cir. 2002).  Yet
2 | this is one case in which the minimal chance that Plaintiffs could
3 | obtain only limited relief is outweighed by the potential harm to the
4 | City, the Court, and the public if a thirty-day injunction were
5 | imposed.

**CONCLUSION**

7 |      Although the record at this time demonstrates that Plaintiffs
8 | have standing to pursue their free speech claims and that their
9 | challenge to the erection of the E! News billboard is ripe, they have
10 | failed to demonstrate that they have any chance of prevailing on the
11 | merits of their claims or that any of the other Winter factors justify
12 | issuance of a preliminary injunction.  The motion is therefore DENIED.
13 | **IT IS SO ORDERED.**

15 | **DATED:    November 12, 2010**      _____
16 |                                        **AUDREY B. COLLINS**
17 |                              **CHIEF UNITED STATES DISTRICT JUDGE**